IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ADAMA KOUADIO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 12 C 1763 |
| ) | |
| HARTFORD LIFE AND ACCIDENT ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Adama Kouadio has sued Hartford Life and Accident Insurance Company pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 (ERISA), seeking recovery of long-term disability benefits and a declaratory judgment that he is entitled to ongoing benefits. Kouadio and Hartford Life have filed cross-motions for summary judgment. For the reasons stated below, the Court grants Hartford Life's motion for summary judgment and denies Kouadio's motion for summary judgment.

## Background

The Court takes the relevant facts from the parties' Local Rule 56.1(a)(3) statements. Kouadio failed to file a response to Hartford Life's Rule 56.1(a)(3) statement as required by Rule 56.1(b)(3). Hartford Life's factual allegations are therefore deemed admitted to the extent they are supported by the record. *See Smith v. Lamz*, 321 F.3d 680, 682-83 (7th Cir. 2003); *Malec v. Sanford*, 191 F.R.D. 581, 583

(N.D. Ill. 2000).

Kouadio began working as an electronic technician for Baxter International, Inc. in January 2007. Through his employment with Baxter, he participated in a group disability plan underwritten by Hartford Life.

Under the terms of the group disability plan, an eligible participant is entitled to long-term disability benefits if he can show that he is "disabled." The plan sets out two definitions of "disabled." Under the first definition, a claimant is disabled and is entitled to long-term disability benefits if he cannot perform his particular job. After a claimant receives twelve months of benefits, the definition of disability changes, and a claimant is entitled to further benefits only if he cannot perform *any* job.

Beginning in June or July 2007, Kouadio began experiencing neck pain. Believing the pain was not very serious, Kouadio waited before seeking treatment from his physician, Dr. Chinyung See. Kouadio stopped working on September 21, 2007, and on September 25, 2007, he had an x-ray taken of his cervical spine. The x-ray revealed scoliosis of the cervicodorsal spine, soft tissue calcifications anterior to his C3, C4, and C5 vertebrae, and spurs at the C6 and C7 vertebrae with narrowing of the right neural foramina. The x-ray also showed a loss of his cervical spine's normal lordotic curve.

Two days later, on September 27, 2007, Kouadio filed a claim for short-term disability benefits. In connection with this claim, Dr. See submitted an attending physician statement of functionality (APS) dated October 2, 2007. In his APS, Dr. See noted that Kouadio had reported experiencing neck pain both during and after work. He diagnosed Kouadio with cervical muscle spasms and cervical scoliosis, resulting in

decreased range of motion in his neck. Dr. See concluded that Kouadio was restricted from bending his neck down and from raising his left arm over his shoulder more than occasionally but that he was otherwise capable of sitting, standing, and walking for eight hours a day. Hartford Life approved Kouadio's claim (determining that he was unable to perform his then-current occupation) and paid him short-term disability benefits beginning October 4, 2007.

Dr. See completed another APS on October 19, 2007. He reported that Kouadio could return to work if he was not required to stand for more than four hours, bend his neck down, or reach below the shoulder level. Dr. See stated that he expected such restrictions to remain in place for a maximum of four months. Around this time, Kouadio began seeing a physical therapist.

On December 13, 2007 Dr. See reported in a third APS that Kouadio was experiencing pain "on and off." Admin. R. at AR394. He diagnosed Kouadio with acute cervical pain and cervicodorsal scoliosis, and he again restricted Kouadio from bending his neck.

Approximately one month later, on January 18, 2008, Dr. See reported that Kouadio could sit, stand, walk, and drive for eight hours a day, use both hands for repetitive movements, and perform full-time light-duty work. Dr. See also certified that Kouadio was not "totally disabled" from performing either his previous occupation as an electronic technician or from performing "any other occupation or type of employment" on a full-time basis.

Based on Dr. See's referral, Kouadio visited neurosurgeon Dr. James Adamson on January 21, 2008 for a neurological examination and consultation. Kouadio reported

3

that his neck pain had grown more severe over the past nine months. Because the results of Kouadio's neurological examination were normal, however, Dr. Adamson posited that Kouadio's neck pain had a musculoskeletal or soft tissue origin and recommended that Kouadio undergo an MRI to rule out other potential causes of his pain. Kouadio agreed and submitted to an MRI of his cervical spine on January 31, 2008. The MRI revealed a reversal of his cervical lordosis, mild bulging discs and marginal spur formation at the C3-C4 and C4-C5 levels with minimal cervical cord effacement, and mild bulging discs at the C5-C6 and C6-C7 levels without cervical cord effacement.

On February 1, 2008, Dr. See completed his fourth APS. He noted that Kouadio was experiencing tenderness and muscle spasm in the middle cervical region but stated that these symptoms did not prevent him from returning to full-time work so long as he did not engage in "excessive" forward bending of the cervical spine and he stretched his cervical spine and upper body throughout the day. Dr. See reported that he expected such limitations to remain in place for a maximum of five months.

That same day, Kouadio submitted a claim seeking long-term disability benefits. Hartford Life approved the claim in April 2008, citing the restrictions noted by Dr. See that were to remain in place until July 2008 as preventing Kouadio from performing his duties as an electronic technician. It further advised Kouadio that under the terms of the plan, he would qualify as "disabled" after April 7, 2009 only if he was continuously unable to engage in any occupation for which he was qualified.

At a follow-up visit with Dr. Adamson on February 15, 2008, Kouadio reported that bending his neck was still causing him pain even though he was neurologically

stable and did not require neurosurgical intervention. Dr. Adamson recommended that Kouadio continue with physical therapy and that he undergo a functional capacity evaluation. According to Hartford Life's records, however, Kouadio never underwent such an evaluation.

In July 2008, Kouadio sought treatment from Dr. Gerald Frank. In his July 14, 2008 APS, Dr. Frank noted that Kouadio had reported experiencing pain in the back of the neck that radiated to both shoulders. He diagnosed Kouadio with cervical disc syndrome. With respect to restrictions and limitations, Dr. Frank stated that Kouadio was capable of sitting, standing, and walking for eight hours at a time for eight hours total in a day. He also noted that Kouadio could lift twenty-one to fifty pounds occasionally, reach above the shoulder and at waist or desk level occasionally, and reach below his waist or desk level frequently. He also believed that Kouadio could participate in vocational rehabilitation services that included worksite accommodations, identification of alternative work, and retraining assistance. Dr. Frank did not indicate that Kouadio had any neck-related limitations.

Shortly thereafter, Hartford Life began reviewing Kouadio's file to determine whether he would be eligible for long-term disability benefits after April 7, 2009. In doing so, Hartford Life conducted an employability analysis to determine whether there were any occupations in Kouadio's geographic area that were consistent with his qualifications and his functional limitations as described by Dr. Frank. Hartford Life examined Kouadio's resume and other documents reflecting his education, training, and experience. These materials showed, among other things, that Kouadio was fluent in both French and English, had a bachelor's degree in computer information systems,

and was proficient in various computer programming languages. Using a computerized job-matching system, Hartford Life compared Kouadio's skills to those required in over 12,000 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles. It then screened the matches to eliminate all sedentary and light-duty occupations whose physical demands exceeded Kouadio's limitations. The employability analysis identified five industries and six examples of sedentary to light-duty occupations for which Kouadio was qualified and capable of performing.

On March 11, 2009, Hartford Life terminated Kouadio's long-term disability benefits effective April 7, 2009. The termination letter listed the medical reports in Kouadio's file, summarized the APS reports submitted by Dr. See and Dr. Frank, and discussed Hartford Life's employability analysis report. Based on these factors, it concluded that Kouadio could engage in some occupations and therefore no longer met the definition of "disabled" under the plan.

Kouadio appealed Hartford Life's termination of his long-term disability benefits on September 8, 2009. In conjunction with his letter of appeal, Kouadio submitted additional medical records, including a letter from pain specialist Dr. Anatoly Arber. In his letter, Dr. Arber explained that he had found a somewhat limited range of motion in Kouadio's cervical spine that he attributed to pain. He also stated that Kouadio's pain was caused by degenerative disc disease of the cervical spine causing spinal stenosis, right occipital headaches, and right radicular pain. Dr. Arber noted that although he had recommended administering a cervical epidural steroid injection, Kouadio declined and was given a Medrol pack instead.

As part of the appeal process, Hartford Life retained Dr. Erik Shaw to perform a

review of Kouadio's records.  Based on the clinical documentation, Dr. Shaw's conversation with Dr. Frank, the lack of any functional capacity evaluations in the file, and Dr. See and Dr. Frank's APS reports, Dr. Shaw determined that Kouadio's work capacity as of April 7, 2009 was consistent with full-time employment at a medium level of physical demand.

On November 24, 2009, Hartford Life reaffirmed its termination of Kouadio's long-term disability benefits.  Its letter stated that the medical documentation in Kouadio's file was "consistent with Kouadio's ability to perform full-time sedentary to medium work as of 4/7/2009, with restrictions and limitations." *Id.* at AR84.  In support of this finding, Hartford Life reiterated the functional limitations set forth in the APS reports of Dr. See and Dr. Frank and stated that the occupations identified by the employability analysis were consistent with the restrictions indicated by Kouadio's own treating physicians.  The letter also summarized Dr. Shaw's conclusions and noted Kouadio's failure to provide any results of a functional capacity evaluation.

## Discussion

On cross-motions for summary judgment, the court assesses whether each movant has satisfied the requirements of Federal Rule of Civil Procedure 56.  *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).  Summary judgment is proper when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)).

7

A denial of benefits is reviewed *de novo* under ERISA "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan gives the administrator or fiduciary discretionary authority, a court applies an "arbitrary and capricious" standard of review. *Hess v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, 502 F.3d 725, 727 (7th Cir. 2007). The parties agree that the plan at issue here provides such discretionary authority. Thus the arbitrary and capricious standard applies.

The Court's review under the arbitrary and capricious standard is deferential. The question is not whether the Court would have reached the same decision as the fiduciary. *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) ("Questions of judgment are left to the plan administrator, and it is not [the court's] function to decide whether [the court] would reach the same conclusion as the administrator.") (internal quotation marks omitted); *see also Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006) ("[U]nder an arbitrary and capricious review, neither this Court, nor the district court, will attempt to make a determination between competing expert opinions."). Nevertheless, review under this standard "is not a euphemism for a rubber-stamp." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 483 (7th Cir. 2009). A fiduciary's decision will be upheld only if "specific reasons for the denial are communicated to the claimant and supported by record evidence." *Raybourne v. Cigna Life Ins. Co. of New York*, 576 F.3d 444, 449 (7th Cir. 2009). Further, the Court must "remain cognizant of the conflict of interest that exists when the [fiduciary] has both the discretionary authority to determine eligibility for benefits and the obligation to

8

pay benefits when due." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (internal quotation marks omitted). The presence of such a conflict, which exists in this case, will "act as a tiebreaker when [ ] other factors are closely balanced." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

Kouadio asserts that Hartford Life's decision denying his claim for long-term disability benefits was arbitrary and capricious. He argues that his treating physicians concluded that he was incapable of working in a light-duty occupation but that Hartford Life unreasonably ignored these opinions. Kouadio also contends that Hartford Life failed to take into account his neck pain, unreasonably relied on the employability analysis report, and operated under a conflict of interest. The Court addresses these arguments in turn.

Kouadio first argues that Hartford Life acted arbitrarily and capriciously by ignoring his treating physicians' opinions in favor of its own consultants' opinions. In support of this argument, Kouadio contends that his treating physicians agreed that he was unable to work in any occupation due to his cervical condition.

The Court disagrees. Kouadio's physicians believed that he was capable of working in a light-duty occupation. In his first three APS reports dated October 2, 2007, October 19, 2007, and December 13, 2007, Dr. See stated that Kouadio could not bend his neck down, a limitation that impaired Kouadio from performing his own occupation. On January 14, 2008, however, Dr. See upgraded Kouadio's condition, certifying in a report that Kouadio was not "totally disabled" from performing either his previous occupation as an electronic technician or any other light-duty occupation on a full-time basis. Admin. R. at AR693. Dr. See clarified this report in his February 1, 2008 APS,

explaining that Kouadio could return to full-time work so long as he did not engage in "excessive" forward bending of the neck and was able to stretch his cervical spine and upper body throughout the day. *Id.* at AR475. He noted that he expected these limitations to remain in place for a maximum of five months. After Dr. See's neck-related limitations expired in July 2008, Dr. Frank reported in an APS that although Kouadio experienced neck pain, it would not prohibit him from engaging in activities consistent with a light-duty occupation. He stated that Kouadio could sit, stand, and walk for eight hours at a time for eight hours a day. Though he limited how often Kouadio could lift, carry, and reach above his shoulder or waist level to "occasional," he did not state that Kouadio had any neck-related limitations.

In short, the record reflects, contrary to Kouadio's argument, that his own physicians believed he was capable of working full-time in a light-duty occupation by April 2009. Thus Kouadio's argument that Hartford Life terminated his benefits after improperly "rejecting the opinion[s] of his physicians," *see* Pl's Mem. at 11, carries no weight. It is true that fiduciaries may not arbitrarily refuse to credit reliable opinions of a claimant's treating physicians. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003). In this case, however, that is not what Hartford Life did. To the contrary, Hartford Life actually *relied* on Kouadio's treating physicians' opinions in terminating his long-term disability benefits. In its initial termination letter, for instance, Hartford Life cited the functional capacity described in both Dr. See's October 7, 2007 APS and Dr. Frank's July 29, 2008 APS. Hartford Life then repeated the exact limitations noted by Dr. Frank and explained that it based its employability analysis on such information. Hartford Life's letter denying Kouadio's appeal was even more comprehensive. After

expressly incorporating its reasoning from its initial termination letter, Hartford Life also summarized the diagnoses and limitations detailed not only by Dr. See and Dr. Frank, but also by Dr. Adamson and Kouadio's physical therapist. In doing so, Hartford Life noted that the opinions of Kouadio's physicians and physical therapist were consistent, and it again relied on Dr. Frank's assessment of Kouadio's capacities and limitations in determining that Kouadio could perform sedentary to light-duty work. Thus the record clearly reflects that Hartford Life not only considered Kouadio's treating physicians' opinions but in fact credited them in its decision to terminate Kouadio's long-term benefits.

Kouadio also argues that Hartford Life improperly credited the opinion of its consulting physician, Dr. Shaw, who simply reviewed the medical files and APS reports. He contends that this Court should find Dr. Shaw's opinion less reliable because "a consultant engaged by a plan may have an incentive to make a finding of not disabled." Pl.'s Mem. at 12 (internal quotation marks omitted). Whatever force that argument might carry in some cases, it fails here. Hartford Life did not rely on Dr. Shaw's opinion to the exclusion of Kouadio's treating physicians' opinions; rather, Dr. Shaw's opinion confirmed the opinions of Kouadio's own physicians that he was capable of performing light-duty work. Hartford Life's decision to credit Dr. Shaw, along with Kouadio's treating physicians, is not indicative of arbitrary or capricious decision making.

Kouadio contends that Hartford Life failed to take into account his subjective reports of cervical pain. The Seventh Circuit has held that evidence of subjective pain cannot be discounted simply on the ground that it is "self-serving." *Diaz*, 499 F.3d at 645; *Hawkins v. First Union Corp.*, 326 F.3d 914 (7th Cir. 2003). But although "a plan

may not deny benefits solely on the basis that the symptoms of the claimed disability are subjective, a plan may deny benefits because a claimant has failed properly to document pain-induced functional limitations." *Majeski*, 590 F.3d at 485.

In this case, Hartford Life not only considered Kouadio's pain, but it also pointed out evidence that suggested that Kouadio's pain diminished over time. In its initial termination letter, Hartford Life acknowledged Kouadio's reports of "pain radiating in the neck to both shoulders" and "pain in the back of [his] neck" caused by the cervical condition reflected in an MRI taken of Kouadio's cervical spine. Admin. R. at AR97. Hartford Life also observed in its letter denying Kouadio's appeal that his "file indicate[d] that [he] was experiencing symptoms related to cervical muscle spasm, cervical scoliosis and osteoarthritis" and that he had reported "pain when rotating his neck" to neurologist Dr. James Adamson and "neck pain radiating to the shoulders" to pain management specialist Dr. Anatoly Arber. *Id.* at AR80-81. Hartford Life nevertheless determined that Kouadio's physical therapy discharge notes suggested that this pain had diminished and that his cervical condition had improved. The record supports this conclusion. For instance, on December 12, 2007, Kouadio's physical therapist documented that Kouadio had reported feeling a ten percent improvement since beginning therapy. Approximately two weeks later, on December 26, 2007, the physical therapist wrote that Kouadio's pain was "steadily decreasing" and that Kouadio said he was feeling better overall. *Id.* at AR673. By February 1, 2008, Kouadio's assessment was that he was "making gains." *Id.* at AR674. Given the improvement noted in these reports, Kouadio's failure to provide evidence that he submitted to a functional capacity exam, and his treating physicians' opinions that his pain did not prevent him from

engaging in light-duty work, the Court cannot conclude that Hartford Life acted arbitrarily in determining that although Kouadio "may experience symptoms related to his neck condition . . . the totality of the evidence fails to support restrictions and limitations that would have precluded his ability to continuously engage in any occupation as of 4/7/2009." *Id.* at AR83.

Kouadio further argues that Hartford Life's employability analysis report was unreasonable because the assessment did not address whether forward neck bending was required in light-duty occupations. As indicated earlier, however, by April 2009, Kouadio's own physicians did not detail any neck-related limitations on his ability to work. The only restrictions noted in Dr. Frank's APS – the last and most current APS on file at the time of Hartford Life's denial of benefits – stated that Kouadio could sit, stand, and walk for eight hours at a time for a total of eight hours in a day; lift and carry twenty-one to fifty pounds occasionally; reach above the shoulder, waist, or desk level occasionally; and reach below his waist or desk level frequently. Given these circumstances, it was not unreasonable for Harford Life not to factor neck-bending limitations into its employability analysis.

Finally, Kouadio contends that Hartford Life's conflict of interest affected its decision to terminate benefits because it both determined Kouadio's eligibility for benefits and was responsible for paying those benefits. A conflict of interest exists where, as in this case, "responsibility for both claim determinations and pay-outs is vested in the same entity." *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 831 (7th Cir. 2009). But the mere existence of a structural conflict, which is "a given in almost all ERISA cases," is not determinative by itself. *Marrs v. Motorola, Inc.*,

577 F.3d 783, 789 (7th Cir. 2009). Rather, the Court must "consider how heavily [Hartford Life's] conflict weighs in the [arbitrary and capricious] balance." *Raybourne*, 576 F.3d at 450. Although a conflict of interest is only a single factor, it will function as a tiebreaker in a close case "where circumstances suggest a higher likelihood that it affected the benefits decision." *Glenn*, 554 U.S. at 117.

The record does not suggest that Hartford Life's conflict of interest affected its decision making in Kouadio's case. Hartford Life considered all of the evidence submitted by Kouadio, as did the insurer's consulting physicians, and its employability analysis took into account Kouadio's most recent limitations and restrictions as noted by Dr. Frank. In addition to the absence of any indicia suggesting that any conflict of interest had an impact on the insurer's analysis, this is, quite simply, not a close case in which the ordinary structural conflict tips the scales. Because Hartford Life's decision was well-supported by the record, it survives this Court's deferential review.

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment [docket no. 27], denies plaintiff's cross-motion for summary judgment [docket no. 30], and directs the Clerk to enter judgment in favor of the defendant.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 1, 2013

14